IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidation Agent for the
N&W Poca Division Federal Credit Union,

      Plaintiff,

v.                          CIVIL ACTION NO. 1:09-0724

DEBORAH G. BAILEY, et al,

      Defendants.

MEMORANDUM OPINION AND ORDER

      Pending before the court is plaintiff's motion for summary judgment against defendant Christopher D. Mullins.  (Doc. No. 88).  Defendant has failed to respond to the motion.  For reasons expressed more fully below, the motion for summary judgment is GRANTED in part and DENIED in part.

Background

      On or about October 3, 2008, the National Credit Union Administration Board ("NCUAB"), an independent agency within the executive branch of the federal government, placed N&W Poca Division Federal Credit Union ("N&W Credit Union") into involuntary liquidation due to its insolvency and appointed itself as Liquidating Agent, as required by the Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1787(a)(1)(A).  See Affidavit of Jennifer Murphy at ¶¶ 2-3 (hereinafter "Murphy Aff. at ¶ ___") (attached as Exhibit A to Motion for Summary Judgment).  N&W Credit Union was a federal credit union, organized and existing

under the Federal Credit Union Act, located in Bluefield, West Virginia whose members primarily included employees and family members of the Norfolk & Southern Railroad and American Electric Power. See id. at ¶¶ 4 and 6. In its capacity as Liquidating Agent and pursuant to 12 U.S.C. § 1787(b)(2), NCUAB succeeded to all rights, titles, powers, and privileges of N&W Credit Union. See id. at § 5. At all relevant times, Rebecca L. Poe was employed as the assistant manager of N&W Credit Union and her mother, Deborah G. Bailey was the manager. See id. at ¶¶ 7-8. Pamela M. Mullins was a teller. See id. at ¶ 9. Defendant Christopher D. Mullins is the son of Pamela Mullins and was a member of N&W Credit Union's Supervisory Committee. See id.

On June 26, 2009, NCUAB filed the instant complaint against Poe, Mullins, and others setting forth the following claims: Conversion (Count I); Breach of Fiduciary Duty (Count II); Fraud (Count III); Civil Conspiracy to Commit Fraud (Count IV); Gross Negligence (Count V); Negligent Misrepresentation (Count VI); and Negligence (Count VII). The specific counts in which Christopher Mullins is named are Counts I, II, III, and IV. Plaintiff seeks actual damages in the amount of at least $2,472,792.00, as well as punitive damages, attorney's fees, and interest.

Subsequent to the filing of the instant lawsuit, Poe and Mullins were convicted of bank fraud and/or aiding and abetting the same, in violation of 18 U.S.C. §§ 1344 and 2, in the United

2

States District Court for the Southern District of West Virginia. See United States v. Poe, Criminal Action No. 1:10-00118 and United States v. Mullins, Criminal Action No. 1:10-00120. Specifically, the charging documents[1] to which Poe and Mullins pled guilty alleged that from on or about 2003 and continuing through August 2008, Poe and Mullins, aided and abetted by each other did knowingly execute and attempt to execute a scheme and artifice to defraud N&W Credit Union, which scheme involved misrepresentation and concealment of material facts.  See United States v. Poe, Criminal Action No. 1:10-00118 (Doc. No. 5) and United States v. Mullins, Criminal Action No. 1:10-00120 (Doc. No. 5).  Poe and Mullins pled guilty to knowingly creating fictitious deposits in their own accounts and the accounts of others, including family members, by posting credits to the accounts and making it appear as if the credit union received funds to support the deposits when, in fact, no such funds had been received by N&W Credit Union.  See id.  Both women also pled guilty to falsely recording payments to their own loan accounts and the accounts of others when, in fact, no such loan payments had been received by N&W Credit Union.  See id.  The charging documents also stated that Poe and Mullins would manually issue

---

[1] Poe pled guilty to an indictment and Mullins pled guilty to an information.  See United States v. Poe, Criminal Action No. 1:10-00118 (Doc. No. 5) and United States v. Mullins, Criminal Action No. 1:10-00120 (Doc. No. 5).  However, the content of both charging documents is substantially similar.

checks on N&W Credit Union's account, held at First Century Bank,
made payable to family members, creditors, and to third parties
for personal expenditures.  See id.  These checks were not
recorded in N&W Credit Union's general ledger.  See id.  Poe and
Mullins also pled guilty to knowingly failing to post ACH
transactions on their accounts and the accounts of others,
knowing that there were insufficient funds in the accounts to
cover the transaction amounts.  See id.  Poe was charged with
concealing the outages at N&W Credit Union by falsifying
information she knew would be included on the quarterly financial
reports of N&W Credit Union.  See United States v. Poe, Criminal
Action No. 1:10-118 (Doc. No. 5).

As part of her written plea agreement with the United
States, Mullins entered into a Stipulation of Facts that reads:

> 4. Beginning in or about 2003, Ms. Mullins began
> making fictitious deposits into her checking account,
> that is, Ms. Mullins posted deposits to her checking
> account to increase the balance of her account and
> therefore, the money available to her without
> supporting those deposits with actual checks or cash to
> N&W Credit Union.  In posting the money to these
> accounts, Ms. Mullins falsified the books and records
> of N&W Credit Union by making it appear on most
> occasions as if a check had been received by N&W Credit
> Union.
>
> 5. After posting fictitious deposits to her
> account, Ms. Mullins used the funds to pay personal
> expenses.
>
> 6. Ms. Mullins additionally posted fictitious
> payments to loan accounts she had in her name at N&W

4

Credit Union, thereby reducing the amount of money she owed to the N&W Credit Union on the loan accounts without making an actual payment to N&W Credit Union.

7. During the course of the scheme, Ms. Mullins additionally posted fictitious deposits to accounts, both checking and loan accounts, of other N&W Credit Union members who were primarily her family members.

8. During the course of the scheme, Ms. Mullins additionally made fictitious deposits to an account at N&W Credit Union to reduce Ms. Mullins' debt to the account holder.

9. During the course of the scheme, Ms. Mullins manually created checks written on the N&W Credit Union's account maintained at First Century Bank which were not recorded in the general ledger of N&W Credit Union.  Some of these checks were made payable to third parties to pay for credit cards or other personal expenses of Ms. Mullins and others were made payable to Ms. Mullins or family members.  In creating the manual checks Ms. Mullins acted with the assistance and knowledge of another individual known to the United States who signed the aforementioned checks on behalf of N&W Credit Union.  Ms. Mullins also signed manual checks on behalf of N&W Credit Union at the request of and for the benefit of the individual known to the United States.

10. During the course of the scheme, Ms. Mullins made purchases and paid expenses by ACH transactions with the knowledge that she did not have sufficient funds to cover the expenses in her accounts at the credit union and with the knowledge that the ACH transactions would not be posted to her account.

11. During the course of the scheme, members of Ms. Mullins' family made purchases and paid expenses through ACH transactions with Ms. Mullins' full knowledge that there were insufficient funds in those

accounts to cover the transactions and that the ACH
transactions were not posted to the accounts.

     12. Ms. Mullins had knowledge of and assisted
another individual known to the United States in
committing similar acts of fraud against N&W Credit
Union and in covering up the scheme.

United States v. Mullins, Criminal Action No. 1:10-120 (Doc. No.

12).

     Furthermore, at her plea hearing on September 13, 2010,

Mullins' participation in the crime of conviction was summarized

by the Assistant United States Attorney as follows:

> Your Honor, if the United States were to proceed to
> trial in this matter, we would offer both documentary
> and testimonial evidence to show that . . . the N&W
> Poca Division Federal Credit Union was, in fact, a
> financial institution, that is, a credit union whose
> deposits were insured by the National Credit Union
> Administration through the National Credit Union Share
> Insurance Fund during all relevant times and that she
> was an employee of the N&W Poca Division Federal Credit
> Union.  She was one of three employees at that credit
> union in Bluefield during the relevant times, and
> that's from approximately 2003 through August of 2008.
> . . . The United States would offer the admissions of
> Ms. Mullins, as well as the testimony of a forensic
> auditor who examined the books and records of the . . .
> N&W credit union. . . .
>
> Specifically, Ms. Mullins would conduct transactions at
> the credit union that would inflate or artificially
> inflate the balance of her personal bank accounts.  She
> would make entries into her accounts that would make it
> appear as if the bank had received either a check or
> cash from her personally, which it would then increase
> her checking account.  Those monies would then be used
> by her to pay personal bills and expenses.  Ms. Mullins
> did that not only for herself, but also made certain

what we call fictitious deposits into accounts of her
spouse, as well as at least one of her sons.

Additionally, Ms. Mullins would makes those
fictitious entries into loan accounts that she
personally had and that family members had at the
credit union and, again, it would just be a manual
entry into the books and records of the credit union
which would increase the — make it look like there was
a credit to the loan account when, in fact, there had
been no check deposited to her, or cash deposited by
her, or any funds received by the credit union to
offset those deposits.

There was another method in which monies were
taken by her out of the bank, and that is that she
would, with the assistance of another individual, issue
manual checks on N&W's bank account at First Century.
And these checks would be written to sometimes third
parties who would be, for example, a credit card, or
even a utility bill that she would owe, and these
checks would be manually issued.  That means they would
not go through the regular books and records or
computer system at the credit union and would not be
logged into their books and records, so it would be
simply a check that would go out, that check would be
honored, but it would never show up or be reflected in
the credit union's system, and there was no money put
into the credit union to support the payment of those
funds going out of the accounts.

<u>United States v. Mullins</u>, Criminal Action No. 1:10-120 (Doc.
No. 19 at pp. 21-23).

Mullins agreed that this description was "substantially
correct" and made no changes to the description of her
activities.  <u>See</u> <u>id.</u> at p. 25.  Mullins also admitted that she

did the acts, intended to do the acts, and was pleading guilty because she was guilty.  See id.

On September 19, 2011, Mullins was sentenced to a term of imprisonment of 30 months to be followed by a three-year period of supervised release.  See United States v. Mullins, Criminal Action No. 1:10-120 (Doc. No. 30).  She was also ordered to pay a $100 special assessment.  See id.  Finally, the court entered an order of restitution in the amount of $2,472,792 with the first $1,472,792 payable to NCUAB, the primary victim, and the remaining $1,000,000 payable to the CUMIS Insurance Society, the secondary victim.  See id.

After a stay to accommodate resolution of the criminal cases against Poe and Mullins, NCUAB moved for summary judgment against Poe and Mullins as to all claims.  In so doing, Murphy's Affidavit indicates that the total loss suffered by NCUAB was § 2,472,792.  Murphy Aff. at ¶ 36; see also Report of Lillie & Co., April 3, 2009 (attached as Exhibit D to Plaintiff's Motion for Summary Judgment).  Neither Poe nor Mullins responded to the motion for summary judgment.  The court granted NCUAB's motion as to Counts I, III, and IV and entered judgment in favor of NCUAB against defendants Rebecca Poe and Pamela Mullins in the amount of $2,472,792.  The motion for summary judgment was denied in all other respects.

The instant motion for summary judgment seeks the entry of judgment in NCUAB's favor on Counts I, II, III, and IV as to Christopher Mullins.  Mr. Mullins did not respond to the motion.

### Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial.  Id. at 322.  If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of
> evidence in support of the plaintiff's
> position will be insufficient; there must be
> evidence on which the jury could reasonably
> find for the plaintiff.  The judge's inquiry,
> therefore, unavoidably asks whether
> reasonable jurors could find, by a
> preponderance of the evidence, that the
> plaintiff is entitled to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If

the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted."  Id. at 250-51.

With respect to a district court's duties in deciding

unopposed summary judgment motions, our appeals court has

counseled:

> In this case, the plaintiff failed to
> respond to the defendants' motion for summary
> judgment, despite repeated notices to do so.
> This failure to respond, however, does not
> fulfill the burdens imposed on moving parties by
> Rule 56.  Section (c) of Rule 56 requires that
> the moving party establish, in addition to the
> absence of a dispute over any material fact, that
> it is "entitled to a judgment as a matter of
> law."  Fed. R. Civ. P. 56(c).  Although the
> failure of a party to respond to a summary
> judgment motion may leave uncontroverted those
> facts established by the motion, the moving party
> must still show that the uncontroverted facts
> entitle the party to "a judgment as a matter of
> law."  The failure to respond to the motion does
> not automatically accomplish this.  Thus, the
> court, in considering a motion for summary
> judgment, must review the motion, even if
> unopposed, and determine from what it has before
> it whether the moving party is entitled to
> summary judgment as a matter of law.  This duty
> of the court is restated in section (e) of the
> rule, providing, "if the adverse party does not
> so respond, summary judgment, if appropriate,

shall be entered against the adverse party."
Fed.R.Civ.P. 56(e) (emphasis in original).

<u>Custer v. Pan Am. Life Ins. Co.</u>, 12 F.3d 410, 416 (4th Cir. 1993).

However, pursuant to Federal Rule of Evidence 201, the court has taken judicial notice of the documents filed in the criminal cases of Poe and Mullins, as well as the record of the proceedings therein.  See <u>Colonial Penn Ins. Co v. Coil</u>, 887 F.2d 1236, 1239 (4th Cir. 1989) ("We note that the most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.") (internal quotations omitted); <u>see also</u> <u>Davis v. Smith</u>, Civil Action No. 3:09CV274-HEH, 2010 WL 3835026, *3 (E.D. Va. Sept. 28, 2010) (taking judicial notice of plaintiff's conviction for possession of explosive material by a convicted felon in deciding defendants' motion for summary judgment).

## **Analysis**

A.      *Conversion (Count I)*

Under West Virginia law, conversion is defined as

> Any distinct act of dominion wrongfully exerted
> over the property of another, and in denial of
> his rights, or inconsistent therewith, may be
> treated as a conversion and it is not necessary
> that the wrongdoer apply the property to his own
> use. And when such conversion is proved the
> plaintiff is entitled to recover irrespective of
> good or bad faith, care or negligence, knowledge
> or ignorance.

Syl. Pt. 17, <u>Rodgers v. Rodgers</u>, 184 W. Va. 82, 399 S.E.2d 664, 668 (1990) (citation and quotation marks omitted).  The West Virginia Supreme Court of Appeals has recognized conversion as occurring whenever one party exercises dominion over the property of another, regardless of intent. <u>See</u> <u>Pine & Cyprus Mfg. Co.</u>, 125 S.E. at 375.

    During his deposition, Christopher Mullins testified:

Q:   Did you have any loans with the credit union?

A:   I did.  At first it was for a car when I first graduated.

* * *

Q:   Were there any other loans, that you recall?

A:   There was, I think, it was a 90-day note, I think that's what they called it.  But we put – I think Rebecca added, like for my school tuition and stuff like that, was put on those loans, as well.

Q:   Do you believe – were those loans paid, or are they still outstanding?

A:   They're outstanding.

* * *

Q:   Did you ever have what they call a PayPal account?

A:   It was about the time when I had that number, like the debit card number.

Q:   And did you use your PayPal account?

A:   I did.

Q:   Do you have any idea how often you used the PayPal account?

12

A:  For a little while I was using it very often on Ebay.

Q:  What kind of things were you purchasing?

A:  I was purchasing either basketball or football cards, buying them and trying to sell them back on Ebay.

* * *

Q:  Any other purchases, that you can recall, other than collectible cards?

A:  I bought, let's see – I mean, like stereo equipment for the vehicle and stuff.

Q:  Did you have enough money in your account at the credit union to cover these purchases?

A:  No.

Q:  Do you know how often that you would have made these purchases without having enough money in your account?

A:  It would have been often.  I don't recall how often.

Q:  Did you – let me ask you: How were you able to make these purchases without having enough money in your account?

A:  It was kind of – I would order it, and I don't know how.  I mean, I just really never got in trouble for not having the money, so I wasn't using any kind of sense, so I just kept buying stuff.  I mean, I'm just going to be honest with you.

Q:  When you say you never got in trouble –

A:  I mean, no check ever bounced, nothing like that ever happened.

* * *

Q:  Did you ever tell your mother that you were using PayPal without –

13

A:   I didn't tell her.  I assumed she knew.

Q:   Did she ever tell you to stop doing that?

A:   She did after – towards the end she did.  I think I
     made maybe two more after she told me to stop.

                        * * *

Q:   And I think you may have already told me this, but
     you were never told how much that you owed on your
     account?

A:   I never asked them; they never told me.

                        * * *

Q:   Sitting here today, do you have an idea how much you
     –

A:   I don't.  I mean, it was a lot of money, I know
     that. . . .

                        * * *

Q:   Now, did you purchase that furniture?

A:   It was – I'd ask – basically the same way I did for
     my college tuition.  I would ask for the money, and
     I was told it was put on those loans.

Q:   And who would you ask?

A:   I would ask Rebecca for that.

Q:   Rebecca Poe?

A:   Right.

Q:   And she would just tell you that she would put it on
     a new loan?

A:   Exactly.

Q:   Did you ever make payments on those loans?

A:   I would take money down there.  I never knew if it
     was going – I mean, it wasn't nowhere near what I

                          14

owed, I knew that, but I didn't know what it was
going towards.

Q:   But you would never make regular payments on it?

A:   No, I didn't.

Q:   Do you have any idea how much you still owe on those
loans?

A:   I don't.

                       * * *

A:   . . . I would just go ask for money to buy birthday
gifts or stuff?

Q:   You knew this money was coming from the credit
union?

A:   I did.  Most of it.  Sometimes they would say, you
know, like Rebecca would be like, "Here, I'll give
you a hundred out of your account, and you can have
a hundred out of my account."

Q:   Do you know how much that added up to?

A:   I have no idea.

                       * * *

Q:   And you say that sometimes they would tell you, or
Rebecca Poe or Pam Mullins would tell you they would
be putting that on your loans?

A:   Loans, yeah, or add it to those loans.  I didn't
know whichever.

Q:   Or they would just take it out of your account?

A:   Right.

Q:   But you knew you didn't have the money in your
account?

A:   Yeah.

Q:   That was a "Yes"?

15

A:   Yes, sir.

Deposition of Christopher Mullins at pp. 15, 16, 18-21, 23-27 (attached as Exhibit B to Motion for Summary Judgment).

The foregoing testimony establishes that Christopher Mullins is liable for common law conversion.  He has admitted taking funds from the credit union and not repaying them.  He has also indicated that he made purchases from his account when he did not have the funds to cover them.  Furthermore, his intent is irrelevant.  Therefore, plaintiff is entitled to summary judgment on Count I.

B.    *Breach of Fiduciary Duty (Count II)*

"The fiduciary duty is a duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person.  It is the highest standard of duty implied by law." Elmore v. State Farm Mut. Auto. Ins. Co., 504 S.E.2d 893, 898 (W. Va. 1998) (internal citations and quotations omitted). However, "[a]s a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship." Id. at 899 (internal citations omitted).  In West Virginia, in order to prevail on a breach of fiduciary duty claim, a plaintiff must show: (1) the existence of a fiduciary relationship; (2) a breach; and (3) damage proximately caused by

16

the breach.  See <u>Wittenberg v. First Indep. Mortg. Co.</u>, Civil
Action No. 3:10-CV-58, 2011 WL 1357483, *17 (N.D.W. Va. Apr. 11,
2011) (citing <u>State ex rel. Affiliated Const. Trades Found. v.</u>
<u>Vieweg</u>, 205 W. Va. 687, 701-02 (1999) (Workman, J. concurring)).

     Plaintiff contends that Christopher Mullins had a
fiduciary relationship with N&W Credit Union because he was a
member of the supervisory committee.  However, Christopher
Mullins testified as to his involvement with the supervisory
committee as follows:

> Q:   Now, did you actually have a position with the
>      credit union?
>
> A:   No, sir, I did not.
>
> Q:   Weren't you a member of the supervisory committee,
>      or was that you?
>
> A:   They put my name on it, but I never did anything.  I
>      never went to any meetings, and I didn't even know
>      what it was.
>
> Q:   When you say "They" put your name on it, who was
>      they?
>
> A:   I guess, Rebecca Poe; my mom, Deborah.  One of them,
>      I'm not sure which.
>
> Q:   So you never actually went to any meetings?
>
> A:   No, sir, I didn't.
>
> Q    You never signed anything for the credit union?
>
> A:   No, I didn't.
>
> Q:   You never had any type of training?
>
> A:   No, sir.

Q:   So do you have any idea what the supervisory
     committee is?

A:   I have no idea.

Deposition of Christopher Mullins at pp. 14-15.

At this juncture, NCUAB has not shown that it is entitled to judgment as a matter of law on its breach of fiduciary duty claim because it has failed to show that Christopher Mullins owed a fiduciary duty to N&W Credit Union. See Pomeroy, Inc. v. Four Jaks, Inc., 11 F. App'x 275, 2001 WL 603415, *1-2 (4th Cir. June 4, 2001) (discussing considerations relevant to a determination of whether fiduciary duty exists). As West Virginia's highest court has made clear, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other. Elmore v. State Farm Mut. Auto. Ins. Co., 504 S.E.2d 893, 898 (W. Va. 1998). In this case, it is arguable, based upon Mr. Mullins' deposition testimony whether he accepted the confidence imposed upon him and agreed to place N&W Credit Union's interests above his own. See Wellman v. Bobcat Oil & Gas, Inc., Civil Action No. 3:10-0147, 2010 WL 2720748, *3 (S.D.W. Va. July 8, 2010) ("[U]nder West Virginia common law, the fiduciary obligation is considered an uncommon and extraordinarily strict duty, imposed upon one who has agreed to support another's interests above his own.").

For these reasons, plaintiff's motion for summary judgment as to Count II will be DENIED.

18

C.      *Fraud (Count III)*

Under West Virginia law, the essential elements in a
cause of action for fraud are: (1) that the act claimed to be
fraudulent was the act of the defendant or induced by him; (2)
that it was material and false; that plaintiff relied upon it and
was justified under the circumstances in relying upon it; and (3)
that he was damaged because he relied upon it.  <u>Tri-State Asphalt
Products, Inc. v. McDonough Co.</u>, 391 S.E.2d 907, 912 (W. Va.
1990) (quoting <u>Lengyel v. Lint</u>, 280 S.E.2d 66, Syl. pt. 1 (W. Va.
1981)).

The evidence adduced thus far falls short of establishing
that defendant is liable for fraud.  Accordingly, plaintiff's
motion is DENIED as to Count III.

D.      *Civil Conspiracy to Commit Fraud (Count IV)*

"A civil conspiracy is a combination of two or more
persons by concerted action to accomplish an unlawful purpose or
to accomplish some purpose, not in itself unlawful, by unlawful
means.  The cause of action is not created by the conspiracy but
by the wrongful acts done by the defendants to the injury of the
plaintiff." <u>Dunn v. Rockwell</u>, 225 W. Va. 43, 689 S.E.2d 255, 269
(2009) (quoting <u>Dixon v. American Indus. Leasing Co.</u>, 162 W. Va.
832, 834, 253 S.E.2d 150, 152 (1979)).

"The elements of a civil conspiracy claim are met
therefore when it is proven that (1) two or more people who are

19

named as defendants (2) agreed to commit overt tortious act(s) for a common purpose (3) committed the overt tortious act(s) (4) proximately causing Plaintiff harm." <u>Marfolk Coal Co., Inc. v. Smith</u>, 274 F.R.D. 193, 197 n. 4 (S.D.W. Va. 2011).  It is well settled that a civil conspiracy requires concerted action by two or more persons or entities.  <u>See Dixon v. American Indus. Leasing Co.</u>, 162 W. Va. 832, 834, 253 S.E.2d 150, 152 (1979). Further, the proponent of a civil conspiracy claim must produce at least circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective and mutual agreement.  <u>See Wenmoth v. Duncan</u>, Civil Action No. 3:08-CV-182, 2009 WL 2707579, *5 (N.D.W. Va. Aug. 26, 2009).

Given the court's ruling on Count III, the motion is also **DENIED** as to Count IV.

Conclusion

For the reasons discussed more fully above, plaintiff's motion for summary judgment on its claims against Christopher Mullins is **GRANTED** as to Count I and **DENIED** in all other respects.  However, the amount of damages attributable to Mr. Mullins must be determined at trial.

The Clerk is directed to send copies of this Order to all counsel of record and unrepresented parties.

**IT IS SO ORDERED** this 20th day of July, 2016.

ENTER:

David A. Faber
Senior United States District Judge